**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN OPEN COURT
U.S.D.C. - Atlanta

NOV 1 3 2024

KEVIN P. WEIMER, Clerk
By: _____
        Deputy Clerk

UNITED STATES OF AMERICA

v.

TIFFANY BROWN

Criminal Indictment

No. 1:22-CR-0359-TWT-JEM

**Superseding**

THE GRAND JURY CHARGES THAT:

### Background

At all times relevant to this Indictment:

1. The Defendant, **TIFFANY BROWN**, resided in the Northern District of Georgia and was the owner of Tribute Contracting LLC ("Tribute").

2. Tribute was registered with the Georgia Secretary of State on or about June 20, 2013, listing Defendant **BROWN** as Tribute's organizer and registered agent. On or about March 22, 2017, Tribute filed its annual registration and identified its principal office address as 1100 Peachtree Street, Suite 200, Atlanta, Georgia 30308.

3. Modus Epicurus, Inc. was a Florida corporation incorporated on or about February 18, 2014 and administratively dissolved in 2015. On or about February 16, 2017, Articles of Incorporation were filed in Florida for Modus Epicurus I Inc. ("Modus Epicurus"), with a business address of 200 S Biscayne Blvd, Suite 2790, Miami, FL 33131, and mailing address of PO Box 35005, McDonough, GA 30281. The filing fees for Modus Epicurus were paid from a bank account belonging to

Defendant **BROWN**. On or about November 9, 2017, a name change was filed with the Florida Secretary of State changing it from Modus Epicurus I Inc. to Modus Epicurus. Modus Epicurus's resident agent and vice president was purportedly "Chuck E. Jones."

4.  Cooking With a Star LLC ("CWAS") was a Georgia-based catering company owned by K.K.R. CWAS was registered with the Georgia Secretary of State on or about October 19, 2017.

5.  Breedlove Foods, Inc. ("Breedlove") was a commercial-sized non-profit food processor based in Lubbock, Texas that developed and produced low-cost humanitarian food aid products, namely dehydrated meals. Since 1994, Breedlove has provided billions of servings of food globally.

6.  Total Quality Logistics, LLC ("TQL") was a freight brokerage and third-party logistics firm based in Ohio.

7.  The Legal Funding Group of Georgia, LLC ("Legal Funding Group") was a Georgia-registered limited liability company based in Savannah, Georgia. Legal Funding Group's business involved providing advances to plaintiffs involved in civil litigation.

8.  The Federal Emergency Management Agency ("FEMA") was an agency of the federal government that coordinated the federal government's role in preparing for, preventing, mitigating the effects of, responding to, and recovering from all domestic disasters, whether natural or man-made.

9.  The System for Award Management ("SAM") was the federal government's primary supplier database. Any business, including any vendors

2

and contractors, wishing to do business with the federal government, including obtaining federal contracts, must be registered in SAM.

10. Tribute was registered with SAM on or about August 20, 2013. Modus Epicurus was registered with SAM on or about July 24, 2014. SAM requires the creation of an MPIN (or Marketing Partner Identification Number). The MPIN acts as the user's password in these systems. A MPIN is required for all users. The same MPIN was used for Tribute and Modus Epicurus.

11. In order for a firm, like Tribute, to be eligible to receive federal contracts, the firm must be registered in SAM and comply with all applicable Federal Acquisition Regulations ("FAR"). The FAR is the primary set of regulations used by federal agencies that govern the acquisition of supplies and services with appropriated funds. The FAR also contains standard solicitation provisions and contract clauses and the various agency-specific supplements.

12. The Defense Federal Acquisition Regulation Supplement ("DFARS") to the FAR is administered by the Department of Defense ("DoD"). The DFARS implements and supplements the FAR. The DFARS contains requirements of law, DoD-wide policies, delegations of FAR authorities, deviations from FAR requirements, and policies and procedures that have a significant effect on the public.

13. Every business registered in SAM has a FAR/DFARS report, also known as a representations and certifications report ("reps and certs"). A FAR/DFARS report is an essential part of the federal contracting process.

3

14. In or about September 2017, Tribute was ineligible to obtain federal contracts from the Government Publishing Office ("GPO"), a federal agency.

15. On or about September 20, 2017, Hurricane Maria made landfall as a Category 4 hurricane in Puerto Rico.

16. On or about September 20, 2017, a major disaster declaration (FEMA-4339-DR) was issued pursuant to the Stafford Act, 42 U.S.C. § 5121 *et seq.*, for Puerto Rico because of the damage resulting from Hurricane Maria.

17. Prior to the issuance of FEMA-4339-DR, FEMA issued solicitation number HSFE70-17-R-MARIAMEALS ("Meal Solicitation") seeking vendors and contractors to provide 3,000,000 self-heating meals for use in Puerto Rico between on or about September 26, 2017 and October 2, 2017.

18. On or about September 20, 2017, FEMA temporarily suspended action under the Meal Solicitation until Hurricane Maria passed to assess actual needs in Puerto Rico and elsewhere.

19. On or about September 25, 2017, FEMA announced that it was accepting new and revised proposals to provide meals to Puerto Rico. The announcement made clear that meals that needed to be heated by microwave or external heat were not acceptable.

20. On or about September 26, 2017, FEMA amended the Meal Solicitation to increase the number of meals it required from 3,000,000 total to 40,000,000 per week. FEMA again advised potential vendors that meals requiring heat by microwave or external heat, such as boiling water, or without a heating element were not acceptable.

4

21. The amended Meal Solicitation also detailed several technical requirements, including the vendor's or contractor's ability to: (i) deliver to FEMA DC-Caribbean; (ii) deliver to a secondary delivery location; and (iii) demonstrate the capability to track shipments and drivers.

### Defendant BROWN's scheme to defraud FEMA in connection with the Meal Solicitation

22. On or about September 28, 2017, the Defendant, **TIFFANY BROWN**, submitted via email a proposal to FEMA in response to the Meal Solicitation that contained multiple material false statements and representations, including falsely stating and representing that: (i) Tribute was not ineligible to receive a federal contract from a federal agency, by submitting expired October 2014 FAR/DFARS reports, when in fact Tribute's February 2017 FAR/DFARS report reflected that Tribute and Defendant **BROWN** were ineligible to be awarded contracts by the GPO, a federal agency; (ii) Tribute could deliver 10 million meals per day with 210 trucks; (iii) Tribute prepositioned its inventory and would have 300,000 meals or more in its possession before an emergency response; (iv) Tribute has the "vehicles, staff and know-how to meet your delivery needs 24 hours a day, 7 days a week"; and (v) Tribute had a partnership with C.H. Robinson to meet delivery requirements.

23. Defendant **BROWN** knew that the representations she made in the September 28, 2017 proposal were false because, as Defendant **BROWN** well knew, Tribute was ineligible to obtain federal contracts from the GPO, a federal agency, did not have a supplier for millions of self-heating meals, and did not

5

have the vehicles or staff Defendant **BROWN** claimed that Tribute did.

Moreover, the October 2014 FAR/DFARS report that Defendant **BROWN**

submitted also contained false certifications regarding Tribute's and Defendant

**BROWN**'s past performance by falsely representing that they had not had one or

more contracts terminated for default in the preceding 3-year period when in fact

the Bureau of Prisons had terminated two contracts with Tribute in or about May

2014 and July 2014.

24. Defendant **BROWN** in fact plagiarized significant portions of her

September 28, 2017 proposal from various sources, including an academic article

and other company websites.

25. Defendant **BROWN** also knew that the 2014 FAR/DFARS report she

submitted on behalf of Tribute was not its most recent report and that Tribute

was ineligible to receive federal contracts from the GPO because the United

States Marine Corps ("USMC") had rescinded a contract awarded to Defendant

**BROWN** and Tribute on or about September 26, 2017. The USMC rescinded the

contract when it discovered that Defendant **BROWN** had submitted an expired

2014 FAR/DFARS report to obtain the USMC contract—the same FAR/DFARS

report Defendant **BROWN** submitted to FEMA as part of her September 28

submission. The USMC advised Defendant **BROWN** that the USMC contract had

been rescinded because Tribute's 2014 FAR/DFARS report was inaccurate;

Tribute was ineligible to obtain a federal contract from the GPO.

26. On or about October 1, 2017, at approximately 2:08 p.m., Defendant

**BROWN** emailed FEMA in connection with the Meal Solicitation and falsely

6

represented that "I receive [sic] firm confirmation from my core suppliers for 30 million self-heating meals in 30 days." At that time, Defendant **BROWN** and Tribute had not contracted with any suppliers to provide such meals.

27. On or about October 1, 2017, at approximately 9:11 p.m., Defendant **BROWN** emailed FEMA in connection with the Meal Solicitation and again falsely represented that "I have received firm confirmation from my core suppliers for 30 million self-heating meals in 30 days at $5.10 per meal." Defendant **BROWN**'s email also included a tentative schedule under which she and Tribute would begin delivering 1,000,000 meals a day by October 7, 2017. Defendant **BROWN** and Tribute did not deliver 1,000,000 meals that day or any other day to FEMA.

28. Between on or about September 30, 2017 and October 2, 2017, Defendant **BROWN** repeatedly attempted to secure a source who could provide millions of self-heating meals. Defendant **BROWN** failed to secure any such source. By way of example, on or about October 1, 2017, a potential supplier advised Defendant **BROWN** via email that it could not produce 30 million self-heating meals in 30 days. On or about October 2, 2017, another potential supplier, Meal Kit Supply, advised Defendant **BROWN** that "[w]e are currently in pre-order status and do not have inventory to fulfill" a request for 30 million self-heating meals. Yet another potential supplier, Action Meals, a Canadian-based vendor, advised on or about October 2, 2017, that it could provide just 62,000 meals and that heaters would cost extra and be shipped separately.

7

29. On or about October 2, 2017, Defendant **BROWN** falsely represented to FEMA that at least some portion of the self-heating meals she was procuring were from Action Meals based in Canada. In actuality, Defendant **BROWN** never procured a supply of self-heating meals from Action Meals or any other Canadian-based supplier.

30. Based on Defendant **BROWN**'s materially false statements and representations regarding Tribute's capabilities and resources, on or about October 3, 2017, FEMA awarded Tribute a $155,982,000 contract requiring that Defendant **BROWN** deliver 30,000,000 self-heating meals between October 7, 2017 and October 23, 2017 (the "FEMA contract"), beginning with a delivery of 1,000,000 meals on October 7, 2017.

31. After being awarded the FEMA contract, Defendant **BROWN** repeatedly made efforts to lull FEMA into a false sense of security and allay concerns FEMA might have about Defendant **BROWN**'s and Tribute's ability to successfully deliver 30,000,000 self-heating meals by October 23, 2017, in an attempt to conceal Defendant **BROWN**'s and Tribute's actual inability to successfully fulfill the FEMA contract. Defendant **BROWN**'s efforts included, among others, falsely representing to FEMA: (i) why any shipments were delayed; (ii) whether Defendant **BROWN** had actually procured the necessary self-heating meals; and (iii) whether conforming menus had been in fact delivered.

32. On or about October 6, 2017, Defendant **BROWN** contacted Breedlove via email seeking to purchase 30 million precooked dehydrated meals beginning "if possible" with 1,000,000 meals on October 8, 2017.

8

33. On or about October 7, 2017, Tribute failed to deliver 1,000,000 self-heating meals as required by the FEMA contract. Rather, Defendant **BROWN** falsely represented to FEMA via email on the night of October 7, 2017 that deliveries would not begin until October 9, 2017. In actuality, Defendant **BROWN** had yet to secure any self-heating meals or arrange the necessary shipping logistics.

34. On or about October 9, 2017, at approximately 1:24 p.m., Defendant **BROWN** falsely represented to FEMA via email that she had meals to deliver but the delivery of meals was delayed because of rain and traffic. In actuality, Defendant **BROWN** had yet to secure any self-heating meals or arrange the necessary shipping logistics.

35. On or about October 9, 2017, at approximately 4:53 p.m., Defendant **BROWN** contacted TQL via email requesting a price quote for shipping goods from Atlanta to Jacksonville, Florida and information to establish an account. Later that day, in separate emails, Defendant **BROWN** requested a line of credit application and specified that she was supplying "50,000 natural disaster meals" to FEMA Crowley.

36. On or about October 9, 2017, Defendant **BROWN** submitted a credit application to TQL. In the credit application, Defendant **BROWN** provided Modus Epicurus as a credit reference. Defendant **BROWN** failed to disclose to TQL that she controlled Modus Epicurus.

37. On or about October 9, 2017, at approximately 8:42 p.m., Defendant **BROWN** falsely represented in an email to FEMA that she had meals to ship but the shipment of the meals had been delayed by, among other things, loading

9

delays and the rain from Tropical Storm Nate. Defendant **BROWN** also falsely represented that Tribute would deliver 30,000,000 meals by November 10, 2017. In actuality, Defendant **BROWN** had not secured any vendors who could provide 30,000,000 self-heating meals.

38. On or about October 10, 2017, Defendant **BROWN** also tried to secure a line of credit to ship meals with another logistics company, Echo Global Logistics. Defendant **BROWN** again provided Modus Epicurus as a reference without disclosing that Modus Epicurus was a business Defendant **BROWN** owned and controlled.

39. On or about October 10, 2017, Tribute contracted with CWAS to provide meals. Defendant **BROWN** signed and executed the contract on behalf of Tribute, and K.K.R. signed and executed the contract on behalf of CWAS. CWAS did not have the capability to produce millions of self-heating meals. Under the terms of the contract with CWAS, however, CWAS agreed to produce a tray or pouch containing all of the meal's ingredients, along with a food heater, water pouch, cutlery, salt and pepper, and seasonings. In reality, CWAS only delivered 50,000 dehydrated meals, none of which included a heater, and thus did not conform with the specifications of the FEMA contract. Despite the terms of the contract with CWAS, Defendant **BROWN** knew CWAS would not be providing heaters with its dehydrated meals.

40. On or about October 10, 2017, Defendant **BROWN** solicited, via email, a China-based company, Hong Qiang Charcoal Industry Limited ("Hong Qiang"), to purchase 50,000 bulk flameless heater pouches. Between or about October 10,

10

2017 and October 13, 2017, Defendant **BROWN** exchanged multiple emails with a representative of Hong Qiang regarding the purchase of heater pouches without ever finalizing a deal. Defendant **BROWN** refused to "move forward" because Hong Qiang would not allow her to establish a "NET 7 account," *i.e.*, a payment structure that would have permitted Defendant **BROWN** to pay for the heater pouches after receiving them.

41. On or about October 11, 2017, Breedlove emailed Defendant **BROWN** to confirm its deliverables and each party's responsibilities. Breedlove stated that it "would ship . . . our standard (non-heat resistant) bag of dehydrated product." Breedlove's bags "would state the ingredients & preferred heating instructions." Defendant **BROWN**/Tribute was responsible for, among other items, providing "heat-resistant zipper bags that [Breedlove's] products could be poured into, with a specified amount of bottled water which would also be included in the kit you are providing" and "the heating bag that the zipper bag would be placed into for cooking/heating." Breedlove expressly stated that it "makes no claim that [its] product is an MRE. Our product is a dehydrated rice/soup blend that requires water and heat to reconstitute." Defendant **BROWN** replied that same day that Breedlove's proposal "is fine" and "[w]e don't have time regarding the testing of heat-resistant zipper bags."

42. On or about October 11, 2017, at approximately 5:15 p.m., Defendant **BROWN** submitted via email to FEMA two bills of ladings that falsely represented that a total of 50,000 self-heating meals that she had procured from CWAS, and that conformed to the terms of the FEMA contract, had been

11

delivered to Jacksonville, Florida in partial fulfilment of the FEMA contract. In actuality, Defendant **BROWN** knew this was false because the meals were non-conforming, as they were not self-heating meals.

43. On or about October 11, 2017, Defendant **BROWN** also submitted a Public Voucher for Purchases and Services Other than Personal, Treasury Standard Form 1034, requesting payment of $255,000 in connection with the delivery of the 50,000 non-confirming meals. Defendant **BROWN** falsely certified "that all payments requested are for appropriate purposes and in accordance set forth in the contract." Defendant **BROWN** knew this certification was false because the 50,000 meals that had been sourced from CWAS were not self-heating meals. FEMA received this voucher on or about October 12, 2017.

44. On or about October 12, 2017, at approximately 11:15 p.m., Defendant **BROWN** falsely represented to FEMA in an email that the "heating bag and pouch" will arrive in a separate box. In the same email, Defendant **BROWN** falsely represented to FEMA that the meals and heaters would be combined in the next shipment. In actuality, Defendant **BROWN** never secured any heating bags or pouches for any future shipments.

45. In reliance on Defendant **BROWN's** false representations in the bills of lading that Tribute had delivered 50,000 self-heating meals, FEMA approved paying Defendant **BROWN** and Tribute $255,000.

46. On or about October 13, 2017, Defendant **BROWN** and Breedlove entered into a contract under which Breedlove agreed to provide 36,000 dehydrated meals per day between October 18, 2017 and November 1, 2017, and 72,000

12

dehydrated meals per day from November 2, 2017 until November 7, 2017, for a total of 828,000 dehydrated meals. These meals were not self-heating and Breedlove was not required to provide a heating source. Rather, Tribute was responsible for providing the heating source and heatable pouches for these meals.

47. On or about October 17, 2017, at approximately 1:18 p.m., Breedlove advised Defendant **BROWN** via email that her proposed bill of lading needed to be modified to reflect that the "Product description should read Dehydrated Meals."

48. On or about October 17, 2017, at approximately 3:04 p.m., Defendant **BROWN** sent an email falsely advising the shipper, TQL, that Breedlove's bill of lading would not be correct and that its driver should "take it but then throw it away." Defendant **BROWN** further advised that her bill of lading was the "one they needed to use." Defendant **BROWN** also directed that TQL tell its drivers to not "share the one" provided by Defendant **BROWN**. Defendant **BROWN** requested that TQL use her bill of lading to conceal the fact that the meals provided by Breedlove were not self-heating and thus non-conforming under the FEMA contract.

49. On or about October 17, 2017, Defendant **BROWN** exchanged emails with Kobayashi Consumer Products, LLC about potentially purchasing 1,500,000 handwarmers. Handwarmers could not be used to heat meals.

50. On or about October 18, 2017, a global forwarding agent with C.H. Robinson, a third-party logistics company, advised Defendant **BROWN** via

13

email that C.H. Robinson could not ship heater bags from China to the United States that Defendant **BROWN** had purportedly contracted to purchase from Hong Qiang because they contained a hazardous material.

51. On or about October 19, 2017, at approximately 11:57 a.m., Defendant **BROWN** emailed FEMA falsely representing that "we had concerns about the Canadian supplier expiration date." Defendant **BROWN** never secured a Canadian supplier to provide meals. In this same email, Defendant **BROWN** made several other false representations to FEMA, including that Tribute would be shipping "adhesive heater attachments" for the meals and that FEMA would receive all 30 million meals by November 7, 2017.

52. On or about October 19, 2017, over multiple emails, FEMA notified Defendant **BROWN** that it was terminating the FEMA contract.

53. On or about October 20, 2017, Defendant **BROWN** opened a business bank account at PNC Bank in the name Tribute Contracting, LLC ("Tribute PNC x8357 account") at a PNC branch located in Atlanta, Georgia. Defendant **BROWN** was the sole signatory on this account.

54. On or about October 20, 2017, FEMA electronically wired $255,000 to the Tribute PNC x8357 account. The balance in the account prior to this deposit was $0.00. That same day, Defendant **BROWN** withdrew over $100,000 from the Tribute PNC x8357 account.

55. On or about October 23, 2017, FEMA provided via email formal notification to Defendant **BROWN** that FEMA had terminated the FEMA contract for cause.

14

56. On or about October 24, 2017, Defendant **BROWN** transferred $132,444 from the Tribute PNC x8357 account to another PNC bank account she controlled.

57. Following the cancelation of the FEMA contract, Defendant **BROWN** attempted to have FEMA reimburse her for the purported costs Defendant **BROWN** and Tribute incurred in the purchase of goods and services from various subcontractors and vendors in connection with the FEMA contract, which included submitting various fraudulent and fabricated documents, including:

> a. On or about December 13, 2017, when Defendant **BROWN**, through counsel, submitted to FEMA a fraudulent $72,0000 invoice from Hong Qiang for heater bags that Defendant **BROWN** never purchased; and
>
> b. On or about June 6, 2019, when Defendant **BROWN**, through counsel, submitted multiple fraudulent invoices from Modus Epicurus purporting to document that Defendant **BROWN** had obtained the necessary heater bags for the meals when, in fact, she had not.

**Defendant BROWN's scheme to defraud Legal Funding Group**

58. Defendant **BROWN** never paid TQL for the freight brokerage services
TQL rendered in October 2017 in connection with the transportation of meals
under the FEMA contract. On or about February 22, 2018, TQL filed a complaint
against Defendant **BROWN** and Tribute in the Court of Common Pleas in
Clermont County, Ohio. On or about April 12, 2018, TQL received a default
judgment against Defendant **BROWN** and Tribute in the amount of $13,523.87.
On or about August 25, 2018, TQL filed the judgment against Defendant
**BROWN** and Tribute in the Superior Court of Fulton County, Georgia.

59. On or about January 25, 2019, TQL's Chief Legal Officer sent a letter to
Florida-based attorney C.D.B., who claimed to represent Tribute. TQL's letter
noted that Tribute's attorney appeared to have been "uninformed, or in the
alternative, misinformed of the actual facts at issue." The letter also stated that
Tribute was liable for the existing judgment and "[t]hus, no payment will be
forthcoming."

60. On or about February 4, 2019, TQL's Chief Legal Officer received an email
from jrosenstein@tributecontracting.com, beginning, "My name is Jerry
Rosenstein and I am in house Counsel at Tribute Contracting LLC. I will be
taking over the case from this point on." The message appeared to be responsive
to the January 25 letter sent by TQL to C.D.B. "Jerry Rosenstein" alleged that
TQL's "late delivery . . . ultimately cost Tribute Contracting LLC their lucrative
multi-million [FEMA] contract." The email also blamed TQL for being the reason
that Tribute's owner, Defendant **BROWN**, "fac[ed] a lifetime ban from working

16

with FEMA in the future." The message concluded by notifying TQL that Tribute
was "open to all offers of settlement within 5 days of receipt of this letter." A
letter with identical wording from "Jerry Rosenstein" was also received by TQL
in Ohio on or about February 4, 2019. The letterhead appeared as if it were from
Tribute, and "Dr. Tiffany Brown" was copied on the letter.

61. On or about February 15, 2019, TQL's Chief Legal Counsel exchanged
three emails with the individual purporting to be "Jerry Rosenstein" at
jrosenstein@tributecontracting.com. These were the only messages sent by TQL's
Chief Legal Officer to "Jerry Rosenstein." In the first message, TQL's Chief Legal
Counsel forwarded his January 25 letter, originally sent to C.D.B., noting that the
letter "clearly addresses any and all issues at hand." In response, "Jerry
Rosenstein" acknowledged previously receiving the letter, indicated that Tribute
may file "counterclaims," and stated, "We would like to settle this matter outside
of the courts. Do you have monetary settlement amount in mind?" In response,
TQL's Chief Legal Counsel referred again to the January 25 letter summarizing
TQL's position and stated, "Given that background, it is unclear why we would
be looking to resolve this." "Jerry Rosenstein" responded by stating that late
delivery "caused Tribute Contracting LLC contract to be terminated," and—
referencing an email from a TQL employee involved in the October 2017 food
deliveries—concluded, "I have no problems sharing this email for you to see if
we are discussing an settlement." In his third and final communication to "Jerry
Rosenstein," TQL's Chief Legal Counsel responded, "as it currently stands, we
only have bills of lading demonstrating timely and successful delivery."

62. At no point did TQL make a settlement offer or extend a settlement agreement to "Jerry Rosenstein," to Defendant **BROWN**, or to anyone else who claimed to represent Tribute.

63. In or about early March 2019, Defendant **BROWN** retained Georgia-based attorney A.H. to assist her in securing an advance on a supposed settlement from TQL. A.H. relied upon information supplied directly from Defendant **BROWN** and from emails he received from "Jerry Rosenstein," including communications in which "Jerry Rosenstein" appeared to discuss a settlement of $3 million to $5 million with TQL's Chief Legal Counsel.

64. A.H. was not involved in any purported settlement discussions with TQL on behalf of Defendant **BROWN** or Tribute. Nor did A.H. ever meet Tribute's supposed in-house counsel, "Jerry Rosenstein."

65. On or about March 5, 2019, B.E., owner of the Legal Funding Group, received an email from A.H. stating that Defendant **BROWN** had an interest in obtaining an advance on a forthcoming "five million dollar settlement figure" that "has been negotiated and agreed upon" with respect to an alleged contract dispute with FEMA.

66. Based on information received from Defendant **BROWN** and A.H., including a draft settlement agreement for $5 million between Defendant **BROWN** and TQL and communications purportedly from "Jerry Rosenstein" regarding the settlement, Legal Funding Group agreed to provide Defendant **BROWN** advances totaling over $1 million by entering into three Purchase

Agreements with Defendant **BROWN** for "her proceeds from the FEMA case" as follows:

|    | Purchase Agreement Date (on or about) | Total Funding |
|----|---------------------------------------|---------------|
| a. | March 5, 2019                         | $816,000.00   |
| b. | September 9, 2019                     | $136,000.00   |
| c. | September 9, 2019                     | $68,000.00    |

Legal Funding Group wired the funds to accounts controlled by Defendant **BROWN** on or about the dates of those contracts.

67. On or about July 15, 2019, Defendant **BROWN**, proceeding pro se, filed a civil suit against TQL in the U.S. District Court for the Southern District of Ohio. In the complaint, Defendant **BROWN** alleged that her $155 million FEMA contract was cancelled due to TQL's late delivery. Defendant **BROWN** sought punitive damages in the amount of $50 million.

68. On or about December 2, 2019, Defendant **BROWN** emailed the attorney representing TQL in her federal lawsuit and asked: "Do you want to make a deal on this?" On or about December 5, 2019, TQL's attorney responded: "TQL has a judgment in place. Of course, it would like that judgment paid by Tribute. With respect to the lawsuit you filed after TQL obtained its judgment against Tribute, it is without merit. I would suggest that you simply voluntarily dismiss your lawsuit. Otherwise, we will simply have to wait for a ruling from the Court on TQL's Motion."

69. On or about January 28, 2020, A.H. emailed the Legal Funding Group an Addendum to Settlement and Release Agreement ("Addendum") signed by Defendant **BROWN** on or about January 21, 2020, and purportedly signed by TQL's CEO on or about January 22, 2020. The Addendum included an escalating schedule of penalty fees should TQL fail to pay a $6.5 million "settlement" on or before January 22, 2020, as purportedly agreed to in a January 8, 2020 Settlement Agreement. The signature of TQL's CEO was forged, and the company's name was incorrectly listed as Total Quality Logistics, Inc., rather than Total Quality Logistics, LLC. A.H. received the purportedly executed Addendum from Defendant **BROWN**.

70. On or about February 1, 2020, Defendant **BROWN** established an account in the name of "James Wilson" with J2 Web Services, a Voice Over IP company based in California. Defendant **BROWN** chose phone number 513-XXX-2768 for "James Wilson," corresponding with the area code for TQL's headquarters in Ohio.

71. On or about February 6, 2020, A.H. received an email from "James Wilson," who was purportedly an "in house counsel" at TQL. This email appeared to come from jwilson@tql.com. "James Wilson" stated that A.H.'s client should "personally send me $500,000 via wire transfer" in exchange for the release of "the settlement amount." Wilson's signature block in the email contains phone number 513-XXX-2768 and the tql.com email address of jwilson@tql.com. The email's header information reflects that it was actually sent

from a tiffanycbrown.com email address, which was an email account subscribed to by Defendant **BROWN**.

72. On or about February 7, 2020, B.E., president of Legal Funding Group, and Defendant **BROWN** called TQL on a three-way phone call and spoke to the legal assistant to TQL's Chief Legal Officer. B.E. asked TQL's representative questions regarding Defendant **BROWN**'s purported settlement agreement with TQL, and Defendant **BROWN** said that she was supposed to receive $6.5 million from TQL. TQL's representative asked Defendant **BROWN** to email her the purported settlement documents. At or about 11:38 a.m. on February 7, 2020, Defendant **BROWN**, using her tributecontracting.com email address, emailed a purported January 8, 2020 Settlement Agreement and Addendum to the legal assistant of TQL's Chief Legal Officer, and stated, "Please confirm whether [sic] the authenticity of the attached documents." That same day, TQL's Chief Legal Officer responded via email to Defendant **BROWN**, stating "Please be advised that these are clearly forged documents." At approximately 12:51 p.m. that same day, Defendant **BROWN** responded, "We received them from James Wilson who represented himself as an employee of Total Quality Logistics. Feel free to have law enforcement to call me on my cell phone 678-XXX-7787. We have filed an [sic] complaint for Internet crimes Division with FBI."

73. The Purchase Agreements between Defendant **BROWN** and Legal Funding Group included a payment schedule, resulting in significant penalties for late payment. Although she received over $1 million under the Purchase Agreements, Defendant **BROWN** made no payments to Legal Funding Group.

## Counts One through Eleven
(18 U.S.C. § 1040 – Major Disaster Fraud)

74. The factual allegations contained in Paragraphs 1 through 57 of this Indictment are re-alleged and incorporated as if fully set forth herein.

75. On or about the dates below, in the Northern District of Georgia and elsewhere, in any matter involving any benefit authorized, transported, transmitted, transferred, disbursed, and paid in connection with a major disaster declaration under section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5170), where the authorization, transportation, transmission, transfer, disbursement, and payment of the benefit was in and affected interstate and foreign commerce, and the benefit was a record, voucher, payment, money, and thing of value of the United States, and any department and agency thereof, the Defendant, **TIFFANY BROWN**, knowingly made materially false, fictitious, and fraudulent statements and representations, and made and used any false writings and documents, as identified below, knowing the same to contain any materially false, fictitious, and fraudulent statements and representations:

| Count | Date | Document Containing False Representation(s) |
|:-----:|:----:|---------------------------------------------|
| 1 | 9/28/2017 | Email and attachments sent by Defendant **BROWN** to FEMA |
| 2 | 10/1/2017 | Email sent at approximately 2:08 p.m. by Defendant **BROWN** to FEMA |
| 3 | 10/1/2017 | Email sent at approximately 9:11 p.m. by Defendant **BROWN** to FEMA |
| 4 | 10/2/2017 | Email sent by Defendant **BROWN** to FEMA |

22

| Count | Date | Document Containing False Representation(s) |
|-------|------|---------------------------------------------|
| 5 | 10/7/2017 | Email sent at approximately 11:48 p.m. by Defendant **BROWN** to FEMA |
| 6 | 10/9/2017 | Email sent at approximately 1:24 p.m. by Defendant **BROWN** to FEMA |
| 7 | 10/9/2017 | Email sent at approximately 8:42 p.m. by Defendant **BROWN** to FEMA |
| 8 | 10/11/2017 | Public voucher and bills of lading sent by Defendant **BROWN** to FEMA |
| 9 | 10/12/2017 | Email and photos sent by Defendant **BROWN** to FEMA |
| 10 | 10/19/2017 | Email sent at approximately 11:57 a.m. by Defendant **BROWN** to FEMA |
| 11 | 12/13/2017 | Submission of fraudulent $72,000 Hong Qiang invoice by Defendant **BROWN** |

All in violation of Title 18, United States Code, Sections 1040(a)(2), (b)(1), and (b)(3).

### Counts Twelve through Twenty-Five
(18 U.S.C. § 1343 – Wire Fraud against FEMA)

76. The factual allegations contained in Paragraphs 1 through 57 of this Indictment are re-alleged and incorporated as if fully set forth herein.

77. On or about the dates set forth in the table below, in the Northern District of Georgia and elsewhere, the Defendant, **TIFFANY BROWN,** for the purpose of executing and attempting to execute the scheme and artifice described above in Paragraphs 22 through 57, such scheme and artifice having been devised and intended to be devised to defraud, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, as well as by omissions of material fact, knowing and having reason to know that the pretenses, representations, promises, and omissions

23

were and would be material, did cause the following wire communications to be transmitted in interstate commerce:

| Count | Date | Wire Communication |
|-------|------|--------------------|
| 12 | 9/28/2017 | Email and attachments sent by Defendant **BROWN** to FEMA |
| 13 | 10/1/2017 | Email sent at approximately 2:08 p.m. by Defendant **BROWN** to FEMA |
| 14 | 10/1/2017 | Email sent at approximately 9:11 p.m. by Defendant **BROWN** to FEMA |
| 15 | 10/2/2017 | Email sent by Defendant **BROWN** to FEMA |
| 16 | 10/6/2017 | Email sent by Defendant **BROWN** to Breedlove |
| 17 | 10/7/2017 | Email sent at approximately 11:48 p.m. by Defendant **BROWN** to FEMA |
| 18 | 10/9/2017 | Email sent at approximately 1:24 p.m. by Defendant **BROWN** to FEMA |
| 19 | 10/9/2017 | Email sent at approximately 4:53 p.m. by Defendant **BROWN** to TQL |
| 20 | 10/10/2017 | Email sent by Defendant **BROWN** to Echo Global Logistics |
| 21 | 10/11/2017 | Email sent at approximately 12:39 p.m. by Defendant **BROWN** to Breedlove |

| Count | Date | Wire Communication |
|-------|------|--------------------|
| 22 | 10/11/2017 | Email sent at approximately 5:15 p.m. by Defendant **BROWN** to FEMA with voucher, invoice, and bills of lading |
| 23 | 10/12/2017 | Email and photos sent by Defendant **BROWN** to FEMA |
| 24 | 10/17/2017 | Email sent by Defendant **BROWN** to TQL |
| 25 | 10/19/2017 | Email sent at approximately 11:57 a.m. by Defendant **BROWN** to FEMA |

All in violation of Title 18, United States Code, Section 1343.

## Counts Twenty-Six through Twenty-Eight
(18 U.S.C. § 1343 – Wire Fraud against Legal Funding Group)

78. The factual allegations contained in Paragraphs 1 through 73 of this Indictment are re-alleged and incorporated as if fully set forth herein.

79. On or about the dates set forth in the table below, in the Northern District of Georgia and elsewhere, the Defendant, **TIFFANY BROWN**, for the purpose of executing and attempting to execute the scheme and artifice described above in Paragraphs 22 through 73, such scheme and artifice having been devised and intended to be devised to defraud, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, as well as by omissions of material fact, knowing and having reason to know that the pretenses, representations, promises, and omissions were and would be material, did cause the following wire communications to be transmitted in interstate commerce:

25

| Count | Date | Wire Communication |
|-------|------|--------------------|
| 26 | 2/7/2020 | Three-way phone call among Defendant **BROWN**, B.E., and TQL |
| 27 | 2/7/2020 | Email sent by Defendant **BROWN** at approximately 11:38 a.m. to TQL employees including forged Settlement Agreement and Addendum |
| 28 | 2/7/2020 | Email sent by Defendant **BROWN** at approximately 12:51 p.m. to TQL employees claiming that forged documents came from "James Wilson" |

All in violation of Title 18, United States Code, Section 1343.

### Count Twenty-Nine
(18 U.S.C. § 641 – Theft of Government Money)

80. The factual allegations contained in Paragraphs 1 through 57 of this Indictment are re-alleged and incorporated as if fully set forth herein.

81. On or about October 20, 2017, in the Northern District of Georgia and elsewhere, the Defendant, **TIFFANY BROWN,** knowingly and willfully stole, purloined, and converted to her use a thing of value of the United States exceeding the sum of $1,000, namely, a $255,000 payment issued by FEMA, an agency of the United States Department of Homeland Security, to which the Defendant was not entitled.

All in violation of Title 18, United States Code, Section 641.

## Counts Thirty through Thirty-Two
(18 U.S.C. § 1957 – Money Laundering)

82. The factual allegations contained in Paragraphs 1 through 57 of this Indictment are re-alleged and incorporated as if fully set forth herein.

83. On or about the dates listed below, in the Northern District of Georgia and elsewhere, the Defendant, **TIFFANY BROWN**, did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, knowing that such transactions involved criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, theft of government funds and wire fraud, in violation of Title 18, United States Code, Section 641, and Title 18, United States Code, Section 1343:

| Count | Date | Transaction Type | Originating Account | Payee/Recipient | Amount |
|-------|------|------------------|---------------------|-----------------|--------|
| 30 | 10/20/2017 | Purchase of Cashier's Check | Tribute Contracting, LLC PNC x8357 | K.K.R. | $90,000 |
| 31 | 10/20/2017 | Cash Withdrawal | Tribute Contracting, LLC PNC x8357 | **TIFFANY BROWN** | $15,500 |
| 32 | 10/24/2017 | Deposit | Tribute Contracting, LLC PNC x8357 | QHB Trust/ **TIFFANY BROWN** Trustee PNC x1593 | $132,444 |

All in violation of Title 18, United States Code, Section 1957.

27

**Forfeiture Provision**

84. Upon conviction of one or more of the offenses alleged in Counts Twelve to Twenty-Eight of this Indictment, the Defendant, **TIFFANY BROWN**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(2) any property, real or personal, constituting and derived from proceeds traceable to each offense, including but not limited to a sum of money in United States currency equal to the amount of proceeds the Defendant obtained as a result of the offenses for which the Defendant is convicted.

85. Upon conviction of the offense alleged in Count Twenty-Nine of this Indictment, the Defendant, **TIFFANY BROWN**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461, any property, constituting, or derived from, proceeds traceable to said violation, including but not limited to a sum of money in United States currency representing the amount of proceeds the Defendant obtained as a result of the offense for which the Defendant is convicted.

86. Upon conviction of one or more of the offenses alleged in Counts Thirty through Thirty-Two of this Indictment, the Defendant, **TIFFANY BROWN**, shall forfeit to the United States pursuant to 18 U.S.C. § 982 (a)(1), any property, real or personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of proceeds the Defendant obtained as a result of the offenses for which the Defendant is convicted.

87. If, as a result of the Defendant's acts or omissions, any forfeitable property:

28

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be

subdivided without undue complexity or difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as

incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of

any other property of the Defendant up to the value of the forfeitable property.

A _____ BILL

_____
FOREPERSON

RYAN K. BUCHANAN
 *United States Attorney*

*/s/ Alex R. Sistla*
ALEX R. SISTLA
 *Assistant United States Attorney*
Georgia Bar No. 845602

*/s/ Jessica Morris*
JESSICA MORRIS
 *Assistant United States Attorney*
 Georgia Bar No. 100907
 600 U.S. Courthouse
 75 Ted Turner Drive SW
 Atlanta, GA 30303
 404-581-6000; Fax: 404-581-6181

29