IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TIFFANY BROWN | Criminal Action No.<br><br>1:23-CR-359-TWT |

**Government's Sentencing Statement**

The United States of America, by Richard Moultrie, Acting United States Attorney, and Alex R. Sistla and Jessica C. Morris, Assistant United States Attorneys for the Northern District of Georgia, files this sentencing statement with respect to Defendant Tiffany Brown: (i) outlining the government's sentencing recommendation; (ii) responding to Brown's lone objection to the Guidelines; and (iii) briefly explaining why the Court should not downward depart or vary on account of the difference between the actual and intended loss in this case. Sentencing is scheduled for Tuesday, April 22, 2025.

First, the government will recommend that the Court sentence Brown to 17.5 years' imprisonment (or 210 months), which is approximately the mid-range of the advisory Guidelines Range. (*See* PSR Part D – Sentencing Options (calculating Brown's advisory range as 188-235 months)). Here, each of the relevant § 3553(a) factors—the nature and circumstances of Brown's offenses, her personal history and characteristics, the advisory Guidelines range, the need to promote specific and general deterrence, and the need to avoid unwarranted sentencing disparities—weigh in favor of imposing a 17.5-year sentence.

1

Brown is a conniving, remorseless huckster. The unrebutted trial evidence proved the depth of Brown's astonishing, unflinching willingness to not only lie and shamelessly exploit others, but to fabricate documents and obfuscate the truth. That Brown has no prior criminal history masks her true nature—she is a serial fraudster, who poses a serious, ongoing threat to the public.

Second, the Court should overrule Brown's objection to the loss amount because she intended to cause $156 million in loss to FEMA. As the Eleventh Circuit has explained, "when a sentencing court is determining the proper punishment for a defendant's fraud, the court uses the reasonable mathematical limit of [her] scheme, rather than [her] concrete result." *United States v. Patterson*, 595 F.3d 1324, 1328 (11th Cir. 2010). "A criminal pays for the price the ambition of [her] acts, not their thoroughness." *Id.*

The evidence at trial, recounted in the PSR and briefly discussed below, conclusively demonstrates that Brown never intended to perform the FEMA contract as required. Rather, from the outset, Brown lied—about her business, her capabilities, and her suppliers. And after being awarded the $156 million self-heating meals contract, Brown continued to lie about her suppliers, about what she actually delivered to FEMA, and about her ability to deliver tens of millions of self-heating meals as required by the contract. Indeed, Brown secured payment from FEMA by submitting fraudulent invoices and bills of ladings and was planning to continue to do so. And when Brown effectively tried to extort a multi-million-dollar settlement from FEMA, she submitted a fraudulent invoice and an interrogatory response littered with falsehoods. Moreover, Brown

repeatedly claimed to others that she had a $156 million contract with FEMA, which she leveraged, in part, to defraud the Legal Funding Group (LFG). Brown also claimed that FEMA owed her $70 million in damages for terminating her contract. And she separately alleged that TQL owed her tens of millions because of its alleged failure to deliver non-confirming meals to FEMA. Brown's conduct, when considered against the backdrop of her history of failing to perform on government contracts, proves that Brown never intended to perform under the FEMA contract. Brown's fanciful suggestion that that she intended to perform by supplying FEMA with non-conforming meals that FEMA may have been "willing" to accept is belied by the evidence. It is pure fiction that FEMA would have accepted dehydrated meals.

Third, the Court should not vary or depart downward because the intended loss is substantially greater than the actual loss. The advisory Guidelines range of 188-235 months does not substantially overstate the seriousness of Brown's offenses, which involved defrauding a federal agency tasked with aiding hurricane victims and defrauding a legal financing company by using a lawyer, fabricating settlement agreements, and creating fictious lawyers. These were not isolated, unrelated fraud schemes, but rather a sophisticated, interconnected series of frauds that lasted several years and in which Brown evinced a clear, unbroken pattern of deception and fraud.

## Background

Following a nearly two-week trial, a jury convicted Brown of all 32 counts arising from her schemes to defraud FEMA and LFG. (PSR ¶¶ 95, 96). The

government presented overwhelming evidence—including testimony from nearly two dozen witnesses and hundreds of exhibits—that Brown engaged in a sophisticated scheme to defraud FEMA (PSR ¶¶ 22-54) and LFG (PSR ¶¶ 55-85). (*See also* PSR ¶¶ 88-94 (briefly summarizing the government's trial evidence)). The evidence at trial demonstrated that Brown, among other things:

- Falsely represented to having procured a Canadian-based supplier, Action Meals, that could supply 30 million self-heating meals in 30 days. (GX-6, GX-7).
- Falsely represented that Action Meals had a US-trademarked name (Heater Meals) to conceal her deceptive conduct. (GX-7)
- Falsely represented Tribute's capabilities and plagiarized material portions of her application to FEMA. (GX-3C, GX-85, GX-86, GX-87)
- Falsely represented having a partnership with CH Robinson. (GX-3C, GX-200 through GX-207, DX-51).
- Falsely certified that she had not been debarred. (GX-3A)
- Submitted to FEMA a fraudulent photograph of an Action Meals package with a fabricated expiration date. (GX-19, GX-19A).
- Submitted fraudulent invoices and bills of lading to FEMA to receive payment for non-conforming, dehydrated meals she obtained from Cooking With A Star. (GX-27A, GX-27C, GX-27D, GX-32A).
- Knowingly prepared altered bills of lading to falsely represent that Tribute was delivering self-heating meals from Breedlove when she

knew that Breedlove only produced dehydrated meals. (GX-138, GX-123, GX-139, GX-431, GX-134, GX-135, PSR ¶¶ 46-47).

- Attempted to source meals and heaters from international suppliers, including from China (and concealing the fact), without obtaining FEMA's prior approval, knowing that FEMA would never pay for meals or heaters produced in China. (*See, e.g.*, GX-201 through GX-206, GX-16).
- Falsely represented up until the day FEMA terminated her contract that Tribute would supply millions of conforming, self-heating meals from Action Meals. (GX-48-1).
- Knowingly submitted fraudulent invoices to FEMA seeking costs to which she was not entitled. (GX-75, GX-80, GX-80A).
- Knowingly concealed from FEMA and logistics companies that she owned and controlled Modus Epicurus. (GX-292, GX-404A).
- Submitted an interrogatory response to FEMA containing scores of false representations. (GX-79).
- Submitted fraudulent bank statements to FEMA during the debarment proceedings. (GX-83).
- Used a lawyer (and her friend), Alcide Honore, to perpetuate the fraud against LFG. (PSR ¶¶ 61-62, 93 (summarizing exhibits introduced through Honore)).

- Created multiple fake attorneys to execute fraud against LFG. (GX-473, GX-900D, GX-1001A, PSR ¶¶ 58-60 ("Jerry Rosenstein"); GX-901, GX-1038/GX-1038A, GX-1041. PSR ¶¶ 77-79 ("James Wilson")).
- Fabricated emails from TQL's general counsel claiming that TQL was interested in settling with Brown/Tribute for millions of dollars. (GX-1001A).
- Fabricated settlement documents that were purportedly between TQL and Tribute. (GX-1001C, GX-1030A, GX-1031, GX-1033B; PSR ¶¶ 74-76).
- Had a demonstrated history of failing to perform on government contracts. (GX-800, GX-812, GX-814).

The PSR correctly determined that Brown's advisory Guidelines range is 188-235 months' imprisonment based on Total Offense Level of 36 and Criminal History Category I (PSR ¶¶ 119, 124, Part D – Sentencing Options). Brown lodged a single objection to the Guidelines calculation. (PSR ¶ 103; Doc. 134, Def. Sent. Memo. at 2-11). She argues that the actual loss ($1.275 million) rather than the intended loss (approximately $156 million) should be used in calculating her advisory Guidelines range because "she intended to perform the contract even though she ultimately did not." (PSR ¶ 103; Doc. 134 Def. Sent. Memo. at 6 ("Brown's actions . . . indicate frantic efforts to source conforming meals and later to provide something that might prove satisfactory to [FEMA's] needs."). As discussed below, the Court should overrule Brown's objection.

6

## Argument

**A. The Court should overrule Brown's objection to the loss amount.**

The PSR correctly determined that the intended loss was approximately $156 million. (PSR ¶ 103). Brown argues that she did not intend to cause $156 million in loss to FEMA because she attempted to perform under the contract. (Doc. 134, Def. Sent. Memo. at 6-11). She is wrong.

Under USSG § 2B1.1, loss is based on the greater of actual or intended loss. In determining intended loss, the Guidelines instruct courts to determine "the pecuniary harm that the defendant purposely sought to inflict," including harm "that would have been impossible or unlikely to occur." USSG § 2B1.1(b)(*)(C)(ii).[1] Thus, "'when a sentencing court is determining the proper punishment for a defendant's fraud, the court uses the reasonable mathematical limit of [her] scheme, rather than [her] concrete result.'" *United States v. Morrow*, No. 21-14056, 2022 U.S. App. LEXIS 31164, at *4 (11th Cir. Nov. 10, 2022) (quoting *Patterson*, 595 F.3d at 1328). Accordingly, a district court does not err in basing its loss calculation "on intent, not results." *United States v. Fuentes*, 723 F. App'x 733, 742 (11th Cir. 2018). In determining a defendant's intent, a court may rely on circumstantial evidence and is not bound to accept any self-serving assertions. *See United States v. Smith*, 853 F. App'x 589, 593-94 (11th Cir. 2021) (citing *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1292 (11th Cir. 2001) and *United States v.*

---

[1] The Guidelines were recently amended to move the definition of "loss," "actual loss," "intended loss," "gain," "pecuniary harm," and "reasonably foreseeable pecuniary harm" from the commentary to USSG § 2B1.1 to a "Notes to Table" under the loss table in § 2B1.1(b)(1).

*Anderson*, 68 F.3d 1050, 1054 (8th Cir. 1995)). And while the government bears the burden of proving loss by a preponderance of the evidence, the "court need only make a reasonable estimate of the loss." USSG § 2B1.1, cmt. n.3(B).

The evidence proved overwhelmingly (and certainly by a preponderance of the evidence) that Brown never intended to perform the FEMA contract. As outlined above, Brown obtained the FEMA self-heating meals contract by lying from the outset about her ability to supply conforming meals. (GX-6, GX-7, PSR ¶¶ 24-32). The unrebutted evidence at trial demonstrated that Brown never procured any self-heating meals, never had a supplier for such meals, but rather sourced and supplied FEMA with non-conforming dehydrated meals. (GX-27A, GX-27C, GX-27D, GX-32A, GX-138, GX-123, GX-139, GX-431, GX-134, GX-135, PSR ¶¶ 39, 46-47). The evidence further showed that Brown concealed the fact that she was supplying with non-conforming meals by fabricating or altering invoices and bills of ladings so that FEMA believed it was receiving self-heating meals (and would pay for the meals). *See, e.g.*, *United States v. Klund*, 59 F.4th 322, 329 (7th Cir. 2023) (district court did not clearly err in calculating loss by including the full bid price in the defendant's outstanding contracts where the "record supports the conclusion that [the defendant] was neither willing nor able to fulfill his contractual obligations," including evidence that the defendant knowingly shipped and requested payment for nonconforming parts and had prior convictions for similar conduct).[2]

---

[2] *Klund* also noted that "even if it was unlikely that the government would have paid invoices for unshipped goods, intended loss 'includes intended

That Brown lied about having a "firm commitment" from her purported Canadian supplier (Action Meals) to secure the contract does not demonstrate an intent to perform. Rather, it demonstrates nothing more than an intent to defraud FEMA in order to be awarded the contract. This is especially so given her past failure to perform on government contracts and submission of expired and fraudulent "reps and certs." (*See, e.g.*, GX-800 (failure to perform Bureau of Prison contracts), GX-812 (debarment by the Government Publishing Office because Brown submitted a fraudulent, altered shipping document), GX-814 (evidence of Brown failing to fulfill Department of Defense contracts), GX-3A (reps and certs)). And her efforts—*after* lying to FEMA that she had a "firm commitment" and *after* being awarded the $156 million contract—to secure a supplier for self-heating meals does not evince an intent to perform but rather is evidence of her intent to defraud; namely, that Brown *knew* her prior representations to FEMA were false. Such conduct was in fact inconsistent with Brown's representations to FEMA that she had a "firm commitment" from her supplier to provide 30 million meals. Indeed, Brown never disclosed the truth to FEMA—that she never had a "firm commitment" and had in fact never secured any conforming meals. On the contrary, Brown plainly tried to satisfy her

---

pecuniary harm that would have been impossible or unlikely to occur." 59 F.4th at 329 (citation omitted). Likewise, even if it was unlikely that FEMA would have continued to pay Brown for supplying non-conforming dehydrated meals, this does not impact the intended loss calculation. *See, e.g.*, *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997) ("It is not required that an intended loss be realistically possible.").

contractual obligations by supplying FEMA with non-conforming meals and lying about it. *Cf. United States v. Smith*, 853 F. App'x 589, 593-94 (11th Cir. 2021) (rejecting defendant's argument that intended loss would have been zero if the scheme had been successful and observing that the defendant continued to solicit fraudulent loans until his company "collapsed" and thus the defendant's "own actions . . . contradict and undermine his claims"). And this continued until the day FEMA terminated the contract—Brown proposed shipping FEMA non-conforming microwaveable meals and lied that she had self-heating meals en route from Action Meals. (PSR ¶¶ 49-51; GX-48-1).

Brown suggests that because FEMA was willing to modify the delivery schedule, it may have also agreed to accept dehydrated meals rather than self-heating meals. (Doc. 134, Def. Sent. Memo. at 8-9). She points to no evidence in the record to support this claim. On the contrary, every relevant FEMA witness testified that FEMA would not have accepted dehydrated meals.[3] Indeed, Brown was very much aware of this fact because she submitted altered/fabricated invoices and bills of lading falsely representing that she had supplied self-heating meals.[4]

---

[3] This was for multiple reasons, including the impracticability of Hurricane Maria victims to cook dehydrated meals because of the lack of potable water and electricity in Puerto Rico.

[4] This argument is absurd on its face. First, Brown never sought to modify the contract. Second, if FEMA was willing to accept dehydrated meals in lieu of self-heating meals, there would have been no reason for FEMA to terminate the contract. Third, there would be no criminal prosecution if FEMA had accepted dehydrated meals under the meal solicitation.

    For at least two reasons, it is equally unhelpful to Brown's argument that she "intended to perform" by notifying FEMA that heaters would be shipped separately. (Doc. 134, Def. Sent. Memo. at 8-9). First, FEMA never authorized Brown to ship the meals and heaters separately. (*See, e.g.*, PSR ¶ 48 (noting email exchange with Brown in which she is informed that shipping meals and heaters is not acceptable)). Second, even if FEMA had authorized Brown to do so—and there's no evidence that FEMA did—Brown never procured any heaters. The unrebutted evidence at trial proved that: (i) Brown never obtained any heaters; (ii) FEMA would not have accepted the heaters she sought to purchase from China; (iii) Brown submitted a fraudulent heater invoice to FEMA; and (iv) Brown lied to agents about returning the heaters. (GX-600 series, GX-201 through GX-206 (email exchanges with CH Robinson), GX-75, GX-80/80A (submission of fraudulent invoices), testimony of former FBI Special Agent D. Law).

    None of the cases Brown cites advances her cause. First, *United States v. Tatum*, 138 F.3d 1344 (11th Cir. 1998), is inapposite because it addressed the district court's failure to credit the defendant with services performed in calculating loss. *Id.* at 1347. That has no bearing here because Brown is not claiming that she is entitled credit for supplying FEMA with non-conforming meals. Brown suggests that *Tatum* reversed the district court for failing to "engage[] in the proper analysis" (Doc. 134, Def. Sent. Memo. at 4), but this is incorrect. Rather, the court of appeals faulted the district court for failing to apply a then-relevant application note. *Tatum*, 138 F.3d at 1347 (citation omitted). Although *Tatum*, noted in passing that "[t]he appropriate treatment of victim

losses . . . will vary with the nature of the offense," it did not discuss, much less analyze whether the defendant intended or did not intend to perform the contract at issue.

Second, *United States v. Orton*, 733 F.3d 331 (11th Cir. 1996), is also unhelpful to Brown because it addressed the proper calculation of losses resulting from a Ponzi scheme. *Id.* at 334-35. *Orton* noted that courts "must consider the nature of the scheme in determining what method is to be used to calculate the harm caused or intended." *Id.* at 333 (footnote omitted). In this vein, the court observed there are a wide range of fraudulent schemes, ranging from "theft-like fraud where the perpetrator intends to keep the entire amount" and "contract fraud where the perpetrator . . . fraudulently obtain[s] the contract, [but] intends to perform . . . and to cause no loss to the victim." *Id.* at 334 (footnote omitted). But like *Tatum*, the *Orton* panel did not discuss, much less consider the factual scenario here—in which the defendant fraudulently procures a contract and fails to perform.

Third, *United States v. Syme*, No. 1:23-cr-205-SDG, 2024 U.S. Dist. LEXIS 41737 (N.D. Ga. Mar. 11, 2024), involved an entirely different scheme in which the defendant, Bernard Syme, attempted to finance the purchase of land by "pre-sell[ing] the timber [to loggers] so that he could use the lumber advances to finance the purchase of the land from which the timber would be harvested." *Id.* at *14 (citation omitted). In some cases, a logger sought "verification that the timber was Syme's to sell (and it never was)." *Id.* Syme defrauded the loggers by "forg[ing] documents . . . to show that he owned" the land from which the

12

timber would be harvested. *Id.* But rather than simply taking the loggers' money, the evidence showed that Syme's behavior was "not only consistent with an intent to leverage timber sales to buy land, but also inconsistent with an intent to take the loggers' cash and run." *Id.* at 16 (emphasis deleted). Accordingly, the district court rejected Probation's determination that the loss amount should have been the total amount of the fraudulently obtained cash advances. *Id.* at *12 (holding that the intended loss was $0). Though not entirely clear, Brown appears to suggest that her fraud is analogous to Syme's because FEMA did not advance funds to her making it impossible for Brown "take [FEMA's] cash and run." (Doc. 134, Def. Sent. Memo. at 7-8 (citation omitted)). This argument makes no sense.

*Syme* would be relevant if the circumstances of Brown's fraud were markedly different. Take the situation where Brown had identified a supplier of self-heating meals, but the supplier refused to make them available or sign a contract without a significant deposit. And assume that FEMA *had* offered advance financing (as opposed to what happened here), but only if a contractor (like Brown) could provide documentation proving that that they had secured a supplier. If Brown forged such documentation to secure financing, but in turn used the funds to purchase self-heating meals then her circumstances would closely resemble those in *Syne*. But that is not what happened. Rather, as detailed above, Brown lied in response to the meal solicitation and in performing the contract, including about: (i) Tribute's capabilities in her original proposal; (ii) having a confirmed source for 30 million self-heating meals; (iii) Tribute's

13

capabilities after revising her proposal when FEMA would not extend financing; (iv) the status of deliveries; (v) what actually was delivered to FEMA; and (v) procuring heaters. Unlike in *Syme*, there is no evidence that Brown ever intended to perform under the contract; that is, actually supply self-heating meals to FEMA. Rather, Brown's conduct is consistent with defrauding FEMA to obtain the meals solicitation contract, and then engaging in ongoing fraud during the performance of the contract to conceal the fact that she could not supply any conforming meals, which continued even after being terminated by FEMA.

The law is clear: "when a sentencing court is determining the proper punishment for a defendant's fraud, the court uses the reasonable mathematical limit of [her] scheme, rather than [her] concrete result." *Patterson*, 595 F.3d at 1328 "A criminal pays for the price the ambition of [her] acts, not their thoroughness." *Id.* The "mathematical limit" of Brown's scheme was $156 million. The Court should overrule her objection to loss amount.

### B. Brown's advisory guideline range does not substantially overstate the seriousness of her offenses.

Much of Brown's argument is devoted to reciting criticisms of the fraud guidelines. (Doc. 134, Def. Sent. Memo. at 11-20). Most of these critiques come from outside the Eleventh Circuit and can be lodged indiscriminately in any fraud case. But they have limited salience to the issue at hand—whether Brown's advisory Guidelines range substantially overstates the seriousness of her offenses. And tellingly, none of Brown's arguments consider the nature and seriousness of Brown's fraudulent *schemes*. Rather, they are a mix of "Brown

14

could never have gotten away with this for long" and "FEMA should have known better." (*Id.* at 21-26). But Brown did not simply fraudulently obtain a government contract, fail to perform, cause the government limited actual loss, and move on. Rather, while FEMA was responding to its third Category V hurricane in less than a month, with depleted supplies and exhausted staff, Brown—knowing full well that she was *ineligible* to receive a government contract—embarked on an audacious fraudulent scheme. This was a multi-year odyssey in which Brown lied to FEMA for years, fabricated numerous documents, and lobbed baseless allegations against its employees. In virtually every exchange with FEMA, Brown lied—about her suppliers, about her capabilities, about the timing of deliveries, about what was being delivered, about what she had purchased, about her damages, etc. She even lodged these claims publicly, falsely suggesting malfeasance or misfeasance on the part of FEMA. Moreover, Brown did not simply recycle the same lie over and over (as is often the case with investment frauds) but concocted different lies—depending on the circumstances—designed to conceal and obfuscate her fraud from FEMA. *See supra* pp. 4-6.

Brown attempts to minimize the significance of the value of the FEMA contract, emphasizing that it was unlikely she would "actually realize the [$156] million intended loss figure the PSR assigns." (*See, e.g.*, Doc. 134, Def. Sent. Memo. at 25). But Brown ignores the fact that she leveraged the $156 million FEMA contract to defraud LFG. Brown obtained the fraudulent litigation advances from LFG based in part on a fabricated $5 million settlement agreement

15

with TQL. (PSR ¶¶ 61-63). This purported settlement agreement appeared genuine because Brown had received the $156 million FEMA contract. In other words, that Brown had obtained such a contract gave her the imprimatur of legitimacy. And it would have been highly unlikely that Brown could have successfully (or as readily) defrauded LFG without having fraudulently obtained a nine-figure FEMA contract. But the FEMA contract aside, Brown's argument for a downward departure (or variance) wholly ignores the extraordinarily deceptive conduct she undertook with respect to LFG and TQL—fabricating multiple settlement agreements, creating fictitious lawyers, and using a lawyer (and her friend) to execute the fraud.

The Court should reject Brown's argument that the intended loss of $156 million resulted in an advisory Guidelines range that substantially overstates the seriousness of the offense. Brown's fraud was neither isolated nor limited in scope. Her methods of deception were sophisticated and varied. And there's no indication that Brown would have voluntarily ceased her fraudulent conduct without being caught.

\*   \*   \*   \*   \*

For the foregoing reasons, and any additional ones advanced at sentencing, the Court should overrule Brown's objection to the loss calculation and reject her argument that her advisory Guidelines ranges substantially overstates the seriousness of her offenses.

The government will recommend at sentencing that the Court sentence Brown to 17.5 years' imprisonment (210 months), place her on supervised release for 3

years, and order restitution to the victims. At sentencing, the government will detail why the § 3553(a) factors justify such a sentence.

Respectfully submitted this 21st day of April 2025.

                                          Respectfully submitted,

                                          RICHARD S. MOULTRIE, JR.
                                              *Acting United States Attorney*

                                          /s/ALEX R. SISTLA
                                              *Assistant United States Attorney*
                                          Georgia Bar No. 845602
                                          alex.sistla@usdoj.gov

                                          /s/JESSICA C. MORRIS
                                              *Assistant United States Attorney*
                                          Georgia Bar No. 100907
                                          jessica.morris3@usdoj.gov